[ PHILADELPHIA, DEC. 26, 1839. ]

## DYOTT v. THE COMMONWEALTH.

### IN ERROR.

1. The Court of Criminal Sessions for the City and County of Philadelphia, created by the act of 19th March 1838, has jurisdiction of an indictment for fraudulent insolvency, when the prisoner is committed for trial, by the Court of Common Pleas of the said county.

2. Under the 5th section of the act of 23d September, 1791, when a prisoner on being arraigned stands mute, and the plea of *Not guilty* is entered for him and the trial proceeds, and he, by his counsel, cross-examines the witnesses for the commonwealth, and calls and examines witnesses in his defence, and there is a verdict and judgment, the case comes within the act of 21st February, 1814, and no error can afterwards be assigned appertaining to the precept, venire, drawing, summoning and returning of jurors, &c.

3. In the Court of Criminal Sessions for the City and County of Philadelphia, a prisoner who had been duly tried, was sentenced on the 31st of August, 1839. On the 17th of September following, the Court made an order that in consequence of certain irregularities in the selection of the jury, all bills of indictment found after the first of January, 1839, to which the defendants had not pleaded, should be quashed. On the 5th of October, the Court directed the preceding order to be amended by inserting the following words, " except in cases where there has been a trial." *Held*, that there was no error in this.

THIS was a writ of error to the Court of Criminal Sessions for the City and County of Philadelphia, to remove the record of an indictment against Thomas W. Dyott, for fraudulent insolvency.

The record exhibited the following state of facts. On the 15th of February, 1839, Judge TODD issued the following precept to the clerk of the Court.

" City and County of Philadelphia, ss.

To the Clerk of the Court of Criminal Sessions for the City and County of Philadelphia.

You are hereby ordered to issue to the sheriff and commissioners of the county of Philadelphia, a writ or writs, commanding the said sheriff and commissioners to empanel, and the said sheriff to summon a grand and petit jury to inquire of, and try all causes and matters which may be depending in the said Court of Criminal Sessions for the City and County of Philadelphia, and given them in charge at the sessions thereof, to be holden on the first Monday of March next.

(Dyott v. The Commonwealth.)

In witness whereof, we, the judges of the said Court, have hereunto set our hands and seals, this fifteenth day of February, A. D. 1838.

JAMES TODD." [L. S.]

The venire issued on the same day as follows:

"City and County of Philadelphia, ss.

The commonwealth of Pennsylvania, to the sheriff and commissioners of the said county, greeting.

We command you, and every of you, that in your proper persons you draw from the proper wheel, containing the names of the persons selected for jurors, according to law, the names of twenty-four persons to be grand jurors in our Court of Criminal Sessions, for the City and County of Philadelphia, in and for the said city and county, on the fourth day of March next, at 10 o'clock in the forenoon of that day, and further, that you, the said sheriff, do summon the persons whose names shall be drawn, and every of them to come before our said Court, at the same time and place, to inquire of, and perform all those things which on our part shall be enjoined upon them, and that you the said sheriff, have then and there this writ, and the names and surnames of the persons so summoned, with their additions respectively in a panel hereto annexed, and otherwise to make return at the day and place aforesaid, how you shall have executed this writ.

Witness the Honourable James TODD, President of our Court, at [ L. S. ] Philadelphia, this fifteenth day of February, A. D., 1839.

JAMES ENEU, JR., Clerk."

On the 19th of February, the sheriff and county commissioners made a return of twenty-four grand jurors, setting forth the names and additions and places of residence; concluding as follows:

"We do hereby certify that the foregoing is an accurate list of the names of persons drawn by the sheriff and county commissioners, to serve as grand jurors for a Court of Criminal Sessions, to be holden at Philadelphia, in, and for the city and county of Philadelphia, on the fourth day of March, A. D., 1839, at ten o'clock, in the forenoon of that day.

Witness our hands this nineteenth day of February, A. D. 1839.

DANIEL FITLER, Sheriff.

C. F. HŒCKLEY,
FARMAR BURN,
JON. JOHNSON,
County Commissioners."

The return of the sheriff was as follows: "The execution of the within precept will appear by reference to a certain schedule hereto

(Dyott v. The Commonwealth.)

annexed." Alongside of every juror's name was the letter " L." or " P."; which signified "left" or "personal," with reference to the notice given to the jurors.

On the 27th of March, 1839, the grand jury found a true bill against T. W. Dyott.

The indictment contained eleven counts.—The first count was in the following words:

" In the Court of Criminal Sessions for the City and County of Philadelphia, of March Sessions, eighteen hundred and thirty-nine.

City and County of Philadelphia, ss.

1st Count.—The grand inquest of the Commonwealth of Pennsylvania, inquiring for the body of the city and county of Philadelphia, upon their oaths and affirmations respectively do present, that Thomas W. Dyott, late of the city aforesaid, yeoman, on the twenty-sixth day of December, in the year of our Lord, eighteen hundred and thirty-eight, at the city and county aforesaid, and within the jurisdiction of this Court, with force and arms, etc., made and presented to the honourable the judges of the Court of Common Pleas of the county of Philadelphia, his petition in writing, praying for the benefit of the insolvent laws of this commonwealth, according to the form, force and effect, of the said insolvent laws; and the said Thomas W. Dyott, so petitioning as aforesaid, and being then and there indebted to a certain Bowers Lowber, of the said county, yeoman, and also to divers others, whose names are to the jurors aforesaid unknown, in divers large sums of money, the said Court on the said petition so presented as aforesaid, did then and there appoint the eleventh day of January, in the year of our Lord 1839, for the purpose of hearing the said Thomas W. Dyott and his creditors, at the county court-house, in the city of Philadelphia, on which said last mentioned day, and at the court-house aforesaid, and on the several days and times thereafter, to which the said case was duly adjourned, to wit, at the county aforesaid, the said Court did meet, and sit, for the purpose aforesaid, and the said Thomas W. Dyott fraudulently and wickedly contriving and intending to cheat and defraud the said Bowers Lowber, and others, his creditors as aforesaid, to wit, on the day and year first aforesaid, at the city and county aforesaid, did collude and contrive, with a certain John B. Dyott, and a certain Charles W. Dyott, for the concealment of a part of his estate and effects, to wit, merchandize, consisting of groceries, of great value, to wit, of the value of one hundred thousand dollars, thereby expecting a future benefit to himself, with intent to defraud Bowers Lowber, and others, his creditors, to the evil example of all others in like cases offending, contrary to the form of the act of assembly, in such case made and provided, and against the peace and dignity of the commonwealth of Pennsylvania."

The 2d count charged a fraudulent conveyance to J. B. and C. W. Dyott, of merchandize, of the value of fifty thousand dollars. The 3d, 4th, 5th, 6th and 7th counts charged collusion with various other persons, and conveyance to them of merchandize, furniture and money. The 8th, 9th, 10th and 11th counts, charged the concealment of various sums of money and merchandize.

The venire for the petit jurors was as follows:

" City and County of Philadelphia, ss.

The commonwealth of Pennsylvania to the sheriff and commissioners of the said County, greeting:

We command you, and every of you, that in your proper persons, you draw from the proper wheel containing the names of the persons selected according to law, the names of forty-eight (48) persons to be jurors in our Court of Criminal Sessions for the City and County of Philadelphia, on the first day of April next, at (10) ten o'clock in the forenoon of that day. And further, that you, the said sheriff, do summon the persons whose names shall be so drawn, and every of them, to come before our said Court, at the same time and place, to make up the jurors required for the trial of all issues which may be then and there depending for trial in our said Court. And that you, the said sheriff, have then and there this writ, and the names and surnames of the persons so summoned, with their additions respectively hereto annexed, and otherwise make return, at the day and place aforesaid, how you have executed this writ.

Witness the Honourable James Todd, President of our said Court, at Philadelphia, this eighteenth day of March, in the year [ L. S. ] of our Lord, one thousand eight hundred and thirty-nine.

James Eneu, Jr., Clerk."

The return to this writ, set forth the names, additions and places of residence of forty-eight petit jurors concluding as follows:

" We do hereby certify that the foregoing is an accurate list of persons drawn by the sheriff and county commissioners, to serve as petit jurors for a Court of Criminal Sessions, to be holden at Philadelphia, in and for the city and county of Philadelphia, on the first day of April, A. D. 1839, at ten o'clock in the forenoon of that day.

Witness our hands this nineteenth day of March, A. D. 1839.

Daniel Fitler, Sheriff.

C. F. Hœckley,
Farmar Burn,
Jon. Johnson,

County Commissioners."

The sheriff's return was in all respects similar to that made to the venire for grand jurors.

The case came on for trial on the 30th of April, when the defend-

(Dyott v. The Commonwealth.)

ant was arraigned and stood mute. His counsel then moved to quash the indictment. After argument, the motion was overruled, and the trial ordered on; and on application of the attorney-general the Court ordered the plea of not guilty, to be entered. One of the jurors called, suggested, that he had formed and expressed an opinion; and being challenged for cause by the attorney-general, the Court excused him from serving on the jury. Three others were in like manner excused. On the 1st of June, 1839, the jury returned a verdict of guilty. On the 4th of June, a motion for a new trial was made, which was discharged on the 10th of August and a new trial refused; and on the 30th of August, sentence was passed.

In the same Court on the 17th of September, 1839, on motion of the attorney-general, the Court made the following order.

" That in consequence of the non-compliance of the sheriff and county commissioners with the provisions of the act of assembly for 1834, prescribing the mode in which the jury wheels shall be secured, and the irregular and illegal manner in which the array of jurors for 1839, were returned, all bills of indictment found since the first day of January, 1839, to which the defendants have not pleaded, be quashed."

On the 5th of October, the Court ordered the record of the 17th of September, to be amended by inserting the following words, viz. " except in cases where there has been a trial." On the 12th of October, a motion was made by the defendant's counsel to quash the indictment; which was overruled.

A writ of error having been specially allowed and issued, the record was returned to this Court; and the following exceptions filed.

" 1. The Court of Criminal Sessions had no jurisdiction.

2. There was no order from the Court to issue venires for March, 1839.

3. The venire for grand jurors for March sessions, 1839, was not conformable to law.

4. The grand jury for March, 1839, was not legally constituted, inasmuch as it was composed of incompetent persons.

5. It was not returned according to law.

6. It did not appear that the requisitions of the law had been complied with, either in depositing, selecting or drawing the names of jurors; nor in summoning them.

7. The indictment is defective, inasmuch as it does not state that the matters complained of, appeared to the Court of Common Pleas, upon the hearing of the petition for the benefit of the insolvent laws.

8. It does not state the time and place of the commission of the offences.

9. It does not state that the Court of Common Pleas had committed the defendant to answer any offence.

10. It states the offence to have occurred on December 26th, 1838, the day of presenting the petition.

11. It is not in the language of the act of assembly.

12. It contains eleven distinct and separate offences.

13. It does not appear to have been found at the next sessions after the commitment of the petitioner.

14. It is generally defective.

15. It is generally inconsistent and erroneous.

16. The venire for petit jurors for April Sessions, 1839, is not conformable to law.

17. The venire did not issue until March 18th, 1839, thirteen days before the commencement of the session.

18. The petit jurors for April, 1838, were composed of incompetent persons.

19. The venire was not returned according to law, and the requisitions of law were not complied with, either in depositing, selecting, drawing, or summoning the petit jurors, or any of them.

20. The petit jury, trying the defendant, was irregular and illegally constituted.

21. The trial was wholly irregular.

22. The Court erred in directing a plea to be entered.

23. The record does not exhibit a competent jury.

24. The Court erred in permitting the commonwealth to challenge jurors.

25. The verdict was not rendered until second session after trial, and is irregular, being general upon distinct offences, comprised in the same indictment.

26. The Court was not properly constituted at March, April, May, June, July, or August sessions, 1839.

27. Five jurors were actually impannelled in an another case.

28. The sentence is not conformable to law.

29. The indictment was quashed by order of the Court of Criminal Sessions, on September 17, 1839.

30. The indictment was not found at the first term after commitment of the petitioner; nor does it appear when the petitioner was committed, if at all.

31. It was not tried at the second sessions after commitment.

(Dyott v. The Commonwealth.)

32. The record does not show any commitment of petitioner.

33. General errors."

Mr. *H. M. Phillips* and Mr. *J. R. Ingersoll*, for the plaintiff in error, argued—

1st. That the Court of Criminal Sessions had not jurisdiction of this case. They referred to the acts of 16th June, 1836, § 14. 19th March, 1838, § 4, § 8. 11th March, 1789. The act relating to the Recorder's Court. of the Northern Liberties. *Commonwealth* v. *Thum*, (10 *Serg. & Rawle*, 418.) *Commissioners* v. *Snowden*, (2 *Yeates*, 95.) *Dwarris on Statutes*, 639, &c.

2d. That the venire ought to have been signed "by order of the Court, or of two of the judges;" according to the 108th section of the act of 14th April, 1834.

3d. That the venire ought to have pursued literally the words of the form given in the 109th section of the act of 14th April, 1794.

4th. That the jurors ought all to have been residents of the *city* of Philadelphia, according to the 10th section of the act establishing the Court of Criminal Sessions; whereas it appears by the return, that many of them came from the *county* of Philadelphia.

5th. That the sheriff ought to have returned fully and distinctly, whether he had given personal notice to the jurors, or left copies at their places of residence.

6th. That the requisitions of the act of 1834, relating to the selection of jurors had not been complied with. This was decided by the Court of Criminal Sessions, and by all the other Courts in the city and county of Philadelphia; and the array of jurors had been quashed in every Court. The Criminal Court had quashed all indictments in general terms; and could not by an order made many days afterwards, amend that order, by excepting cases where there had been a trial.

7th. That the indictment was defective in many material respects; and did not charge any offence within the provisions of the 42d section of the act of 16th June, 1836.

8th. That the venire ought to have issued more than thirteen days before the holding of the Court. Act of 19th March, 1838, § 10. Act of 21st February, 1814.

9th. That the defendant, by standing mute, had not lost any right to make exception to the jury process, indictment, or trial. Upon this point the counsel referred to the act of 23d September, 1791; and the act of 21st February, 1814; and cited 2 *Inst.* 568. 3 *Rep.* 27. *Co. Litt.* 357. *Dyer*, 351, b. *Com.* v. *Lesher*, (17 *Serg. & Rawle*, 155.) *The People* v. *Mather*, (4 *Wendell*, 229.) *Commonwealth* v. *Smith*, (2 *Serg. & Rawle*, 300.) *Rowley* v. *Stoddart*, (7 *Johns.* 209.)

Mr. *W. L. Hirst*, for the commonwealth.—The errors assigned have been generally abandoned; only three of note remain to be

considered; and in considering these, we must construe systems: all the statutes applicable to the case were intended as systems.

1. Jurisdiction. The difference between the Quarter Sessions and the old " City Court," and the Mayor's Court, in criminal cases, has ever been a distinction of territory only. Act of February, 1718, (1 *Smith*, 101.) Act of May, 1718, (*Id.* p. 104.) Act of May, 1722, (*Id.* p. 131.) Act of March, 1789, (2 *Smith*, 467.) Act of 1791, (3 *Smith*, 29.) Act of 1794, (*Id.* p. 134.) Act of 1803, (4 *Smith*, 30.) Act of 1812, (5 *Smith*, 344.) This distinction was confirmed by the act of 1836, (*Purdon*, 222,) (passed on the same day that the general jurisdiction law was enacted) giving exclusive jurisdiction of the trial of all such offences committed in the city to the Mayor's Court.

The act of 1838, creating the Criminal Sessions, expressly gives to it all the jurisdiction which the Mayor's Court then possessed; and thus the right of trying this offence was granted in terms. The 11th, 12th, 13th, 14th and 15th sections of that act show that the legislature intended to give universal jurisdiction for the city and county (except that of the Oyer and Terminer) to the new Court: and to take away all the jurisdiction from the Quarter Sessions; leaving that Court without the power to summon a grand or petit jury. The spirit, if not the letter of the law, must be construed to mean that the legislature intended to form one Court for the city and county; and to abolish all conflicting or concurrent jurisdiction.—It is contended, that the Quarter Sessions had, and the Criminal Sessions had not jurisdiction of this case: yet the case was sent by the judge of the former, to the latter Court; the one rejecting the jurisdiction, the other accepting it: thus both Courts have decided where the case belonged. The trial of a case like this by the judges who had prejudged it, was always a vice in the old system. A defendant should have the same right to challenge a judge for cause, as a juror who had formed or expressed an opinion on the merits of the case. Neither was this a main feature, as contended, of the old system; for the District Court had jurisdiction of insolvent cases many years. The law of 1836, (*Purdon*, p. 222,) gave more jurisdiction to the Mayor's Court than is necessary to rely upon here: it gave them jurisdiction of all cases *indictable* in the Quarter Sessions. The distinction between offences *indictable*, and *triable*, in various Courts, is found in various sections of the act. The indictment here lays the offence to have been committed in the city.

2. Errors in the venire. It is conceded that an irregularity existed; the venire for the petit jury having issued thirteen, instead of fifteen days before the first day of the term. But this error is cured by the act of 1814, (*Purdon*, 989.) This Court, in *The Com.* v. *Smith*, (2 *Serg. & Rawle*, 300,) refused to arrest judgment of death, although many glaring errors then existed; one of which errors was, that the venire was directed to the sheriff to return the jurors for the *Quarter Sessions*. The notion that *standing mute* evades the law of

1814, is not sound. The act is express. By the law of 1718, (1 *Smith*, 105), standing mute was a confession of guilt. The act of 1791 (*Purdon*, 498,) directs, that in such cases, a plea shall be entered by the Court, and the trial shall proceed with the same effect as if the defendant had pleaded. In this case the defendant went to trial on the merits, and took the chance of an acquittal. The record shows that he examined many witnesses; and that the trial lasted one month. This was an express waiver, according to the deci- sions on the point of waiver, independently of our statute of jeofails. The standing mute was always considered a contempt. In England it was severely punished, till 12 Geo. 3, when it was declared equivalent to a plea of not guilty; and it was and is an indictable offence in England to advise a prisoner to stand mute. 4 *Black. Com.* 126. The act of 1791 is a benignant act, meant to save a prisoner from the severe penalties of prior laws; and cannot be perverted into an engine to defeat the cherished policy of Pennsyl- vania, to sustain all fair trials on merits. It is a trial that cures errors in the venire of petit juries; not a plea. A plea may be entered terms or years before the venire issues.

3. The order of the Criminal Sessions quashing indictments. This seems to be an intention to force on a Court a decision which they have solemnly said they never intended to make; and to construe their own rule against their own judgment. The rule of Court, if intended by the judges to include the present case, was void for want of power in the Court to make it. The case had been finally disposed of by sentence, and could not incidentally be again heard. A writ of error *coram nobis*, or a writ from this Court, was necessary. The order was amended by the Court themselves soon afterwards; and they had the right to expound their own rules, or amend them at pleasure.

The opinion of the Court was delivered by

Huston, J.—The act relating to insolvent debtors, passed the 16th of June, 1836, among other things, provides as follows:

" Sect. 42. If it shall appear to the Court, upon the hearing of any petition as aforesaid, either by the examination of the petitioner, or other evidence, that there is just ground to believe either—

" 1st. That the insolvency of the petitioner arose from losses by gambling; or by the purchase of lottery tickets; or,

" 2d. That such petitioner has embezzled, or applied to his own use any money or other property with which he had been entrusted, either as banker, agent or depositary, and to the prejudice of the opposing creditors; or

" 3d. That he has concealed any part of his estate or effects, or colluded or contrived with any persons for such concealment, or conveyed the same to any for the use of himself or any of his family or friends, or with the expectation of receiving any future

(Dyott v. The Commonwealth.)

benefit to himself or them, and with intent to defraud his creditors; in every such case, it shall be the duty of the Court to commit such person to the jail of the county, for trial at the Court of Quarter Sessions of the same county."

Section 43 proceeds to direct what shall be the sentence on conviction under each of the above clauses.

On the hearing of the petition of Dr. Dyott, he was committed for trial under the above law. The indictment and trial took place in a Court created by the act of 19th of March, 1838, and styled the Court of Criminal Sessions for the City and County of Philadelphia. One exception to this record was, that this Court had not jurisdiction of the case; and it was said it could only have been tried in the Court of Quarter Sessions for the City and County.

In order to understand this, and ascertain the proper decision, we must refer to other acts of assembly:

Our legislature had, some years ago, appointed three gentlemen of the law to arrange into one act the provisions of the law, where there were several acts of assembly on the same subject. In pursuance of this important duty they reported several bills, which came before the legislature, and after discussion in the usual form, were passed upon and became laws. The last reading of several of these occurred on the same day; and on the same 16th of June, 1836, a law was enacted relative to the powers and jurisdiction of Courts. In section 16, it is provided that the Courts of Quarter Sessions of the peace shall have jurisdiction and power within their respective counties, in certain cases; and after four specifications comes No. 5:—" The Courts of Quarter Sessions shall have jurisdiction in case of fine, penalties, or punishment, imposed by any act of assembly, for offences, misdemeanors, or delinquences, except where it shall be otherwise expressly prescribed and enacted: Provided, nevertheless, that nothing herein shall alter or affect the jurisdiction of the Mayor's Court. And provided, also, that the Mayors' Courts of the several cities of this commonwealth shall have *exclusive* jurisdiction of all offences committed within the limits of their respective cities, which, by any existing law, or any law hereafter to be passed, are or shall be indictable in the Court of Quarter Sessions of the proper county, unless by the terms of the law expressly deprived of such jurisdiction." As Dr. Dyott and his bank were within the city of Philadelphia, it would not be easy to show that his case would not, under these laws, have been cognisable before the Mayor's Court, if it had continued to exist; but the Court of Criminal Sessions was constituted by the act of 19th March, 1838; by the 4th section of which it is constituted a Court of record; has a seal and clerk. Section 5 provides for the appointment of the judges, and fixes their salaries. Section 6. " The said judges shall severally be ex officio justices of the peace," &c., &c. Section 8. " The said Court shall have all the powers and exclusive jurisdiction

within the city and county of Philadelphia, which is now exercised by the Mayor's Court, within the said city, and all the jurisdiction within the said city and county which the Court of Quarter Sessions now have, or may hereafter have, under the acts relating to roads," &c., &c. Section 10. "The grand and petit juries shall be selected from among the qualified citizens of the said city and county." Section 11. The Court is to hold its first session on the first Monday of April, 1838; "and from thenceforth all laws and acts of assembly, giving jurisdiction to the Court of Quarter Sessions of the County of Philadelphia, and all laws and acts of assembly creating or giving jurisdiction to the Mayor's Court for the City of Philadelphia, and the Recorder's Court for the Northern Liberties, Kensington, and Spring Garden Districts; and all other acts of assembly shall be and are hereby repealed, so far as they are inconsistent with this act." Section 12. "The clerk of the Quarter Sessions for the County of Philadelphia shall be ex officio clerk of the said Court," &c. Section 13. "Constables, and all officers whose duty it was to make returns for, or to execute the process of the Quarter Sessions, or Mayor's Court, or Recorder's Court, are to make returns to and execute the process of this Court."

"Section 14. All bills, indictments, records and proceedings which shall be unfinished when the Court hereby created shall go into operation, in the Quarter Sessions of the county of Philadelphia, aforesaid, and the Mayor's Court and Recorder's Court, shall be certified to the said Sessions Court for the city and county of Philadelphia; and the said Court shall proceed therein as if the said proceedings had been commenced in the same, and render judgment, sentence, and decree thereon, and issue all process necessary to enforce the same."

Now, if obvious meaning plainly expressed in positive laws have any force or effect, the Court of Criminal Sessions for the city and county of Philadelphia had jurisdiction of the case before us. It is said that the Court of Quarter Sessions of the county of Philadelphia has exercised jurisdiction of frauds committed, or alleged to be committed under the act about insolvent debtors. Of this, as it has been stated, we only know what was stated. The cases, if any such exist, cannot be judicially noticed, unless judicially before us. The Court of Quarter Sessions is as old as any part of the judiciary system of this state: and it seems to be a well recognised principle, that jurisdiction is not taken from a Court of record, unless by express words, or inference irresistible. It is not unusual that two Courts have concurrent authority; but without saying this is so as to the case before us, we say that the Court before which this case was tried had jurisdiction.

Another objection pressed was, that the venire did not issue, and that the jury were not drawn and summoned according to law. The 10th section of the law, establishing the Court of Criminal

(Dyott *v.* The Commonwealth.)

Sessions, among other things, prescribes that "the grand and petit juries for each session, shall be drawn and summoned as is now directed for the Mayor's Court." Provided, that the venire need not be issued more than fifteen days, nor the jurors summoned more than ten days before the meeting of the Court. Now, it appears and is conceded, that the venire for the petit jury was not issued fifteen days before the meeting of the Court, but only thirteen days before. It also appears that when the trial was ordered on, a motion was made to quash the indictment. This is stated, and not denied, to have been on some objection to the panel of the grand jurors. On investigation, the objection was overruled, and the Court refused to quash. This is not complained of here; the objection is, as above stated, to the traverse jury. The gentleman who appears on the part of the commonwealth did not deny the fact that the venire issued less than fifteen days before the meeting of the Court, nor did he deny that this was an irregularity which would have been error, but he relied on two acts of assembly, particularly the last, as completely curing this irregularity. Before citing them, I may state, that by the common law, a person who, when arraigned, stood mute, was subjected to torture and suffered more than the pain of death by the executioner. Some, however, to avoid a conviction, which would be followed by forfeiture of all the accused had, were found of sufficient firmness of purpose and of nerves, to die under the torture for the purpose of preserving their estates to their children. In this state (then province,) by the 5th section of the act of 1717, a prisoner standing mute, when arraigned, was to suffer as if tried and found guilty by the jury. On the 23d of September, 1791, this was changed by the following enactment:

"Sec. 5. If any prisoner shall, upon his or her arraignment for any capital or inferior offence, stand mute, or not answer directly, or shall peremptorily challenge above the number of persons summoned as jurors for his or her trial, to which he or she is by law entitled, the plea of not guilty shall be entered for him or her on the record; the supernumerary challenges shall be disregarded, and the trial shall proceed in the same manner as if he or she had pleaded not guilty, and for his or her trial had put himself or herself on the country." Although this law has not the words "with like effect," after the words "in the same manner," yet most probably the sense is the same as if those words had been inserted.

From some cause, and probably from several writs of error in criminal cases, two of which are in 6*th Binney, Commonwealth* v. *White* and *Commonwealth* v. *Eaton*, the act of 21st of February, 1814, was passed as follows:

"No verdict hereafter to be given in any Court, civil or criminal, in this commonwealth, shall be set aside, nor shall any judgment in any Court be arrested or revised, nor sentence stayed, for any defect or error in the precept issued for any Court, or in the venire issued

(Dyott *v.* The Commonwealth.)

for summoning and returning of jurors, nor for any defect or error in drawing, summoning or returning any jury or panel of jurors; but a trial or an agreement to try on the merits, or pleading guilty, or the general issue in any case, shall be a waiver of all errors and defects in or relative and appertaining to the said precept, venire, drawing, summoning and returning of jurors."

It is apparent that the exception here, is to the very matter or matters which the last recited act was intended to cure, if defective or irregular. It is not necessary to say, what would have been the consequence if Dr. Dyott had not cross-examined the witnesses for the commonwealth, and had not called and examined witnesses in his defence; and the Court gives no opinion on such a case. After his motion to quash the grand jury was overruled, he refused to plead; in the language of the law, he " stood mute," and by the direction of the Court the plea of not guilty was entered for him on the record. After this, it appears that the trial proceeded, and he called and examined twenty-six or twenty-seven witnesses. The law of 1791 was intended as a favour to persons arraigned in Court for a criminal offence, but it was not intended to go farther or do more than it expresses, and it could not have been intended to operate on, and, in effect, to repeal a law passed in 1814, more than twenty years after its enactment. A prisoner standing mute, with a plea of not guilty entered for him, is to be tried in the same manner as if he had pleaded not guilty; and the verdict and judgment must have the same consequence as to punishment as if he had pleaded; but if he stand mute, and the Court, as they are bound to do, enter the plea of not guilty, and the trial proceeds, and a full defence by witnesses and counsel is made, and if after all this the defendant is to be allowed every exception which was open to him before the law of 1814, we should produce a result never intended and never expressed by the legislature. Any person by standing mute, would repeal, as to himself, the law of 1814, and every person would stand mute. The act of 1814, says, " a trial or agreement to try on the merits, or pleading guilty on the general issue," shall be " a waiver of all errors and defects," in, or relative to the precept, venire, drawing, summoning or returning of jurors. Here there was a full trial on the merits. The defendant, in the language of the act, waived every error and defect in all that related to the jury—he relinquished his right of challenging the array, and, so far as we see, of challenging individual jurors—(though several of them who were creditors, or who had formed opinions, mentioned this to the Court, and on being sworn as to the truth of it, were, by the consent of the attorney-general, directed by the Court to withdraw.) The construction and effect of this act have come before the Court in several civil cases, and in one criminal case where capital punishment followed the charge, (*Commonwealth v. Smith.*) It is true that the defendant had there pleaded not guilty. The Court, our

(Dyott v. The Commonwealth.)

predecessors, however, put it on the fact of a trial on the merits, and decided that all defects, in that case, and there were many in every stage of the process for the jury, were cured by the act in question.

Another error was assigned in this. The sentence on Dr. Dyott was passed on the last day of August term. About the middle of the next term, the Court, on ascertaining that the wheels containing the names of the jurors for the year, had not, after drawing jurors for the several terms, been sealed by the sheriff and commissioners in the manner prescribed by law, directed and ordered that all bills of indictment found since the 1st of January, 1839, and to which the defendants had not pleaded, should be quashed. Afterwards, and in the next term, (the terms are monthly) on the 5th of October, the Court ordered the clerk to correct the above order by adding, "except in cases where there has been a trial." On the 12th of October, a motion was made by his counsel to quash the indictment against Dr. Dyott, and that he be discharged from the sentence and judgment of the Court passed on him in the preceding August term. This was refused by the Court, and is assigned for error.

A Court may correct an entry or judgment entered by them, if by the mistake of their clerk, or the ambiguity or uncertainty of the expressions used in entering it, injustice will be done; or if it is not producing the effect intended by the Court when it was entered. " All indictments to which defendants had not pleaded," would necessarily have excluded all those on which there had been a trial; and the second order for amendment would seem not to have been necessary, if we look at the act of 1791. The question how far, or in what cases, a Court can correct an entry of a judgment once made on their records, has been discussed in different Courts. I shall not cite the cases, not even all in our own Courts. As a general rule, there must be something by which to amend; see *Murray and Cooper*, (6 *Serg. & R.* 124,) and the cases cited 2 *Wharton's Digest*, Judgment, C. These are all civil suits. It is one thing to change a sentence or judgment of a Court in a particular case, and a different thing to make an *order or decree* affecting several cases more specific and precise as *to* what cases it shall embrace. An order in civil cases setting aside or opening a judgment, is often a matter within the discretion of the Court; and it must be an extreme case which will make it the subject of a writ of error, see 2 *Watts*, 376; but it was there said by the chief justice, that this did not apply to judgments after trial and verdict; judgments which could not be opened or set aside after the term. And the law seems to be that after a trial, verdict and judgment, and a term elapsed, the judgment can only be affected by a writ of error from a superior court. If in every criminal case after a trial, the sentence is arrested first by motion, in arrest of judgment, and one term passes; then a motion for a new trial still pending is argued;

(Dyott v. The Commonwealth.)

the opinion of the Court held over, at the fourth term judgment and sentence passed; and after all this, the Court could go back and set all aside, at some future term, for some reason which existed before the trial, and continued to exist and was unnoticed by the defendant in all previous stages, it would introduce strange confusion and uncertainty in the administration of justice. The act of 1814 was passed to prevent this. We are of opinion that there was no error in the proceedings of the Court in this case, but that if it had in October passed a decree or judgment, on motion, vacating and rendering null and void the trial, verdict, judgment and sentence, it would have greatly exceeded its powers.

The above contains all that was urged in the case, and all mentioned by the senior counsel. It is to be regretted that the same matter is sometimes repeated several times, in different words, or one point divided into half a dozen; that errors are sometimes assigned on facts occurring at the trial, when there is nothing on the record to show it; that when only part of the record is submitted to the Court, it is assigned for error, that there is something amiss in what the counsel will not show to us: for example, it is assigned as error No. 12, that there were eleven counts in the indictment; and in No. 25, that the verdict was general on distinct offences: and yet we saw but one count, and nothing except in the assignment of errors to lead us to suspect there were any others. This loose practice of assigning errors is too common, and counsel ought to avoid it. I should not have mentioned it here, if it had not been necessary to show that we did not pass over in silence, errors assigned, and some of which, if they had been supported by the facts of the case, had an imposing appearance; for example—that the commonwealth challenged jurors. Now, it has a right to challenge for cause, and it was not even stated that the attorney-general challenged except for cause. Upon the whole, we see no cause for reversal; and the judgment must be affirmed.

Judgment affirmed.